**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

CIVIL CASE NO._____

REGIONS BANK, an Alabama banking
corporation,

     Plaintiff,

v.

TBG & CC RECREATION, LLC, a
Florida limited liability company,
ARTHUR FALCONE, in his individual
capacity, and EDWARD FALCONE, in his
individual capacity, all jointly and
severally,

     Defendants.

_____/

## COMPLAINT

Plaintiff, REGIONS BANK, an Alabama banking corporation ("Plaintiff" or "REGIONS"), by and through its undersigned counsel, hereby files this Complaint against Defendants, TBG & CC RECREATION, LLC, a Florida limited liability company, ARTHUR FALCONE, in his individual capacity and EDWARD FALCONE, in his individual capacity, all jointly and severally (collectively referred to as the "Defendants") and in support thereof states as follows:

1.     This is an action for damages under a promissory note, forbearance agreement and Swap Agreement (as defined below) between REGIONS and the Defendants. Compensatory damages are in excess of $75,000.00, exclusive of interest, court costs and attorneys' fees.

## PARTIES

2.     Plaintiff, REGIONS BANK, is an Alabama banking corporation organized and incorporated under the laws of the State of Alabama, with its principal place of business in Birmingham, Alabama and is a citizen of the State of Alabama, for the purposes of diversity jurisdiction.  REGIONS is authorized to bring this action in all respects as the present holder of the relevant obligations being sued upon, herein.

3.     Defendant, TBG & CC RECREATION, LLC, ("TBG") is a Florida limited liability company that has conducted business within Palm Beach County, Florida and is sui juris.  TBG may be served in Palm Beach County, Florida and is a resident of the State of Florida for purposes of establishing diversity jurisdiction.

4.     Defendant, ARTHUR FALCONE ("A. FALCONE"), is a permanent resident of Broward County, Florida and has conducted business within Palm Beach County, Florida.  A. FALCONE is being sued individually and is sui juris.  A. FALCONE may be served in Broward County, Florida or any other place he may be found and is a citizen of the State of Florida for purposes of establishing diversity jurisdiction.

5.     Defendant, EDWARD FALCONE ("E. FALCONE"), is a permanent resident of and conducted business within Palm Beach County, Florida.  E. FALCONE is being sued herein individually and is sui juris.  E. FALCONE may be served in Palm Beach County, Florida or any other place he may be found and is a citizen of the State of Florida for purposes of establishing diversity jurisdiction.

## JURISDICTION AND VENUE

6.     Pursuant to 28 U.S.C. §1332 (a), this Court has diversity jurisdiction over this action as there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.00, exclusive of interest, attorneys' fees and costs.

7.      Specifically, there is complete diversity between the parties because the Plaintiff is an Alabama citizen, and the Defendants are citizens of Florida.

8.      This Court has personal jurisdiction over the parties, as all Defendants are residents of the State of Florida.

9.      Under 28 U.S.C. §1391(a), venue is proper in this Court since A. FALCONE and E. FALCONE permanently reside in and consented to the jurisdiction of the judicial district where this action is brought and a substantial part of the events or omissions giving rise to the claims, set forth herein, occurred in the Southern District of Florida.  Under 28 U.S.C. §1391(c), venue is also proper in this Court, as TBG is subject to personal jurisdiction in Palm Beach County, Florida.

10.     All conditions precedent to the institution and maintenance of this action have been performed, waived or excused.

## COUNT I—BREACH OF CONTRACT
(Against TBG & CC Recreation, LLC, Arthur Falcone & Edward Falcone)

11.     REGIONS incorporates by reference the allegations in paragraphs one (1) through ten (10) above, as if set forth fully herein.

12.     On or about February 27, 2008, TBG & CC RECREATION, LLC, a Florida limited liability company, A. FALCONE and E. FALCONE, all jointly and severally, (collectively referred to as the "BORROWERS") requested and REGIONS agreed to make a $5,000,000.00 loan to the BORROWERS, which loan was evidenced by a certain Promissory Note dated as of February 27, 2008, executed by the BORROWERS and made payable to the order of REGIONS in the original principal amount of $5,000,000.00 (the "Original Note").   A true and correct copy of the Original Note is attached hereto as **Exhibit "A"**.

3

13.    On or about March 27, 2009, the BORROWERS subsequently requested and REGIONS agreed to defer six (6) consecutive payments of principal due under the Original Note, commencing with the payment due March 27, 2009, and to pay REGIONS interest only on the outstanding principal balance of the Original Note on each payment due, as evidenced by that certain Forbearance Agreement dated as of March 27, 2009 (the "Forbearance Agreement"), executed by the BORROWERS.   A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit "B"** (the Original Note and Forbearance Agreement as well as all other documents executed by the Defendants in conjunction with these instruments are collected referred to as the "Loan Documents").

14.    REGIONS agreed to forbear any enforcement actions with respect to certain defaults under the Original Note, provided the BORROWERS timely complied with all of the terms and conditions of the Forbearance Agreement.   Specifically, REGIONS agreed to defer required principal payments under the Original Note, as set forth under the Forbearance Agrement, provided that the BORROWERS timely make all interest payments due thereto commencing on March 27, 2009 and continuing on the same day of each month thereafter until and including the payment due on August 27, 2009.   The BORROWERS were further obligated, commencing with the payment due September 27, 2009, to resume timely make principal and interest payments due under the Loan Documents.

15.    A default occurred under the Original Note by virtue of the BORROWERS' failure to timely pay the monthly interest payments due on July 27, 2009 and August 27, 2009, and the BORROWERS' failure to also timely pay the monthly payments of principal and interest due on September 27, 2009 and thereafter.

16.    As a result of the BORROWERS' defaults under the Loan Documents, REGIONS demanded immediate payment of all accelerated, unpaid sums due thereto from the

BORROWERS, as reflected by correspondence dated February 12, 2010 ("Demand Letter").  A true and correct copy of said Demand Letter is attached hereto as **Exhibit "C".**

17.    REGIONS is entitled to assert all right, title and interest as the owner and holder of all rights accruing under the Original Note, Forbearance Agreement and all other Loan Documents referenced both hereinabove and hereinafter.

18.    There is now due, owing and unpaid to REGIONS, under the Original Note, Forbearance Agreement and other Loan Documents as of February 12, 2010, the following amounts:

| | |
|---|---|
| Principal Due: | $ 4,779,063.93 |
| Interest Due as of February 12, 2010 | $    53,658.52 |
| *TOTAL AMOUNT DUE (As of February 12, 2010): | $ 4,832,722.45* |

*This total does not include attorneys' fees, court costs, late charges, or default interest that may be incurred and due under the Original Note and Loan Documents, and additional interest which will continue to accrue.   REGIONS continues to reserve the right to accrue interest at the Default Rate as described under the Loan Documents.

19.    REGIONS has obligated itself to pay its undersigned attorneys a reasonable fee for their services rendered herein, and pursuant to the Loan Documents, REGIONS is entitled to an award of such attorneys' fees and court costs from the BORROWERS, who are obligated to pay same under the terms of the Loan Documents.

WHEREFORE, Plaintiff, REGIONS BANK, demands judgment against Defendants, TBG & CC RECREATION, LLC, a Florida limited liability company, ARTHUR FALCONE, and EDWARD FALCONE, all jointly and severally, for all amounts due under the Loan Documents, including principal, interest, costs and attorneys' fees, and such other and further relief as this Court deems just, legal and proper.

## COUNT II—BREACH OF CONTRACT
### (Against TBG & CC Recreation, LLC, Arthur Falcone & Edward Falcone)

20.     REGIONS incorporates by reference the allegations in paragraphs one (1) through ten (10) above, as if set forth fully herein.

21.     On or about February 15, 2008, REGIONS and TBG & CC RECREATION, LLC, a Florida limited liability company, A. FALCONE and E. FALCONE, all jointly and severally (collectively referred to as the "BORROWERS"), entered into a written International Swap Dealers Association, Inc. Master Agreement ("Swap Agreement"), wherein REGIONS and the BORROWERS agreed to conduct certain business transactions to derive certain mutual financial benefits.   A true and correct copy of the Swap Agreement is attached hereto as **Exhibit "D"**.

22.     Pursuant to the Swap Agreement, the BORROWERS were obligated to make certain timely transactional payments (as described under the Swap Agreement) to REGIONS.

23.     A default occurred under the Swap Agreement by virtue of the BORROWERS' failure to timely make transactional payments due REGIONS on July 28, 2009, August 28, 2009, September 29, 2009, October 28, 2009, November 30, 2009, December 29, 2009 and January 27, 2010, each such nonpayment being an Event of Default and collectively being Events of Default, all as defined under the Swap Agreement ("Events of Default").

24.     Thus, as a result of the Events of Default under the Swap Agreement, REGIONS placed BORROWERS on notice, pursuant to Section 5(a)(i) of the Swap Agreement, of their defaults and demanded payment from the BORROWERS of all outstanding transactional payments, as reflected by REGIONS' correspondence dated February 3, 2010 ("Notice of Default").  A true and correct copy of said Notice of Default is attached hereto as **Exhibit "E"**.

25.     Notwithstanding such demand by REGIONS, BORROWERS failed and refused to cure their Events of Default by the third local business day after the Notice of Default by failing to submit to REGIONS those unpaid transactional payments reflected in the Notice of

6

Default.

26.     On or about February 10, 2010, as a result of the continuing Events of Default under the Swap Agreement, REGIONS terminated all transactions (as described under the Swap Agreement) between REGIONS and the BORROWERS, effective February 12, 2010 and gave notice of same to BORROWERS ("Notice of Early Termination").  A true and correct copy of the Notice of Early Termination is attached hereto as **Exhibit "F"**.

27.     Following the Notice of Early Termination, REGIONS demanded immediate payment of those unpaid sums due from BORROWERS as a result of the early termination of the Swap Agreement, as reflected by REGIONS' correspondence dated February 12, 2010 ("Notice of Amounts Due").  A true and correct copy of said Notice of Amounts Due is attached hereto as **Exhibit "G"**.

28.     REGIONS demanded payment of the damages due under the Swap Agreement, but notwithstanding such demand, BORROWERS have failed and refused to pay same.

29.     There is now due, owing and unpaid to REGIONS by BORROWERS, as of February 12, 2010,  the amount of $431,896.88 ("Swap Agreement Damages")[1].

30.     The BORROWERS breached the Swap Agreement by failing and refusing to remit to REGIONS the Swap Agreement Damages due and owing in accordance with the terms of the Swap Agreement between REGIONS and the BORROWERS.

31.     As a direct result of such breach, REGIONS has incurred damages in an amount in excess of $75,000.00, exclusive of interest, court costs and attorney's fees.

32.     REGIONS has obligated itself to pay its undersigned attorneys a reasonable fee for their services rendered herein, and pursuant to the Swap Agreement, REGIONS is entitled to

---

[1] This total does not include attorneys' fees, costs, late charges, or default interest that may be incurred and due under the Swap Agreement, and additional interest which will continue to accrue.   REGIONS continues to reserve the right to accrue interest at the Default Rate as described under the Swap Agreement.

an award of such attorneys' fees and costs from the BORROWERS, who are obligated to pay same under the terms of the Swap Agreement.

WHEREFORE, Plaintiff, REGIONS BANK, demands judgment against Defendants, TBG & CC RECREATION, LLC, a Florida limited liability company, ARTHUR FALCONE, and EDWARD FALCONE, all jointly and severally, of all amounts due under the Swap Agreement, including interest, court costs and attorneys' fees, and such other and further relief as this Court deems just, legal and proper.

Dated 9th day of March, 2010.

<div style="margin-left: 50%;">

Respectfully submitted,

/s/ Eric. C. Edison_____
ERIC C. EDISON
Florida Bar No. 010379
ece@angelolaw.com
JAMES W. CARPENTER
Florida Bar No. 654256
jwc@angelolaw.com
ANGELO & BANTA, P.A.
515 East Las Olas Boulevard—Suite 850
Fort Lauderdale, FL 33301
Telephone:    954-766-9930
Facsimile:    954-766-9937
Attorneys for Plaintiff, Regions Bank

</div>

92 258 0030935 116937

4

## PROMISSORY NOTE

$5,000,000.00

February 27, 2008
County of Palm Beach, Florida

FOR VALUE RECEIVED, the undersigned, TBG & CC Recreation, LLC, a Florida limited liability company, Arthur Falcone and Edward Falcone, jointly and severally, (collectively "Maker") promise to pay to the order of REGIONS BANK ("Lender") or order, without setoff, deduction, or counterclaim of any kind or nature, at 1555 Palm Beach Lakes Boulevard, Suite 155, West Palm Beach, Florida 33401, or at such other place as Lender may designate in writing, the principal sum of Five Million and No/100 ($5,000,000.00) Dollars, or so much thereof as is from time to time advanced and/or disbursed pursuant to the Loan Agreement between Maker and Lender dated of even date herewith (the "Loan Agreement"), if any, together with interest thereon at the Interest Rate as hereinafter defined, together with all other monies due Lender hereunder, in lawful money of the United States, which shall be legal tender at the time of said payment of the principal and interest and all other monies due Lender hereunder, which shall be payable in accordance with the terms and conditions as set forth below.

1.    TERM/MATURITY DATE.  The term of this Note shall be five (5) years from the date of this Note ("Term") ending on February 27, 2013 ("Maturity Date"), at which time all unpaid principal and interest and any other monies outstanding (including but not limited to outstanding charges and costs) shall be due and payable.

2.    INTEREST RATE.

Interest under this Note shall accrue at the London Interbank Offered Rate (as defined below)(the "Index") plus 150 basis points for the Term of this Note, as such rate changes from time to time.

The Interest Rate shall never exceed the maximum lawful interest permitted under the then applicable laws of the State of Florida.  The Interest Rate and all interest accrued on the principal shall be calculated on a 360 day year, actual number of days elapsed

3.    PAYMENTS.

The Loan shall be payable in principal payments as set forth in, and incorporated herein by reference from, Schedule A attached hereto, together with accrued interest thereon.  All remaining principal and accrued interest shall be due and payable on February 27, 2013.

Payments received after our cut-off times established from time to time or on weekends or bank holidays will be credited as of the next Business Day.

1



4.   MORTGAGE/SECURITY/OTHER LOAN DOCUMENTS. As security for the payment of the indebtedness evidenced by this Note ("Liabilities"), the Maker (among other things) has executed other loan documents for Lender's benefit dated. of even date, including but not limited to the Loan Agreement, a mortgage providing a lien upon Maker's real property and other property ("Mortgage") and swap agreement ("Swap Agreement") (collectively, the Loan Agreement, the Mortgage, the Swap Agreement and all such other loan documents are collectively referred to as "Other Loan Documents"). In addition, Lender is given a lien upon and a security interest in all property of the Maker now or at any time hereafter in the possession of Lender in any capacity whatsoever, including but not limited to any balance or share of any deposit, certificate of deposit account, trust or agency account, as security for the payment of this Note and the Lender is hereby authorized to apply, on or after maturity (whether by acceleration or otherwise) to the payment of this debt any such funds or property in possession of the Lender belonging to any Maker, in such order of application as Lender may from time to time elect, without advance notice.

5.   EVENTS OF DEFAULT. The happening of any of the following events shall constitute an event of default ("Event of Default") hereunder: (a) failure of Maker to pay any principal, interest or any other sums required hereunder when due under this Note, which failure continues for a period of ten (10) days; (b) Maker fails to comply with any other terms and obligations herein and such failure continues for a period of fifteen (15) days following written notice thereof from Lender; (c) an Event of Default shall occur in any instrument securing this Note or in any of the Other Loan Documents, which continues beyond any applicable grace period. Any Event of Default shall entitle Lender to exercise any and all remedies at law and/or in equity, as well as those set forth in this Note and the Other Loan Documents.

6.   REMEDIES AND ACCELERATION. If an Event of Default shall occur hereunder, then Lender may pursue all remedies provided Lender under this Note and/or under any of the Other Loan Documents available at law and/or in equity, which remedies are cumulative and concurrent and may be exercised singularly, jointly, concurrently or successively and as often as said occasion shall occur. In addition, if an Event of Default shall occur hereunder, at Lender's option, Lender may declare immediately due and payable the entire unpaid principal sum and any late charges then remaining unpaid and accrued interest without notice or demand, and said amount due and payable shall bear interest thereon from such date at the Default Rate (as defined hereafter), from time to time. In the Event of Default hereunder, Lender may also declare any and all other liabilities and or obligations of any Maker and/or Obligor, as hereinafter defined, due and payable. If this Note is payable upon demand, then no terms or provisions contained in this paragraph shall be deemed or interpreted to alter or abrogate the demand nature of this Note or the rights of Lender under a demand instrument.

Further, if an Event of Default shall occur hereunder, Lender shall have, in addition to all other remedies at law and/or in equity, and all remedies under this Note and under any of the Other Loan Documents, and under applicable law, all the remedies of a secured

2

party under the Uniform Commercial Code of the State of Florida and, without limiting the generality of the foregoing, Lender shall have the right, at its option, and without notice or demand, to set off against this Note all money owed by Lender in any capacity to any Maker or Obligor as defined herein of this Note, whether or not due; and Lender shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such Event of Default even though such charge is made or entered in the books of Lender subsequent thereto. Lender shall further have the right to transfer into its own name any such collateral and property in the possession or custody of Lender. Upon disposition of any collateral after the occurrence of any Event of Default hereunder, Maker shall be and remain liable for any deficiency, and Lender shall account to Maker for any surplus, but Lender shall have the right to apply all or any part of such surplus (or to hold the same as a reserve) against any and all other liabilities of the Maker and/or any Obligor to Lender.

7. <u>DEFAULT RATE.</u> Upon an Event of Default, this Note, the Liabilities and all sums due hereunder shall bear interest from the date when due (without any prior notice from Lender to Maker or any Obligor), whether by lapse of time or on acceleration, at the Default Rate (as hereinafter defined) until paid. The Default Rate ("Default Rate") shall be a rate of interest equal to the highest rate allowed by law.

8. <u>INTEREST LIMITATION.</u> Notwithstanding anything contained in this Note or any Other Loan Documents to the contrary, in no event shall the Interest Rate and/or amount of interest to accrue, including any interest to accrue at the Default Rate, together with all amounts reserved, charged, or taken by Lender as compensation for fees, services, charges or expenses incidental to the making, negotiation or collection of the loan evidenced hereby, which are deemed to be interest under applicable law, exceed the maximum rate of interest on the unpaid principal balance hereof allowed from time to time by applicable law. If the Interest Rate shall exceed the maximum rate permitted by law, then the Interest Rate shall be deemed automatically reduced to the highest rate permitted by law. If any sum is collected in excess of the applicable maximum rate of interest, the excess sum collected shall be applied to reduce the principal debt or be refunded to Maker, at Lender's option. It is expressly acknowledged and agreed by the Maker that any Interest Rate charged herein and/or the Default Rate of interest is not intended to exceed the maximum rate permitted by law.

9. <u>ATTORNEYS' FEES.</u> All parties liable for the payment of this Note agree to pay the Lender in addition to the principal and interest due and payable herein, all paralegal fees, attorneys' fees and costs, whether or not an action be brought, for the services of counsel (whether before or after maturity or before or after any Event of Default hereunder) to collect under this Note any principal or interest due or any other monies due Lender hereunder, or whether before or after maturity or Event of Default hereunder, to protect the security, if any, or to enforce the performance of any other agreement contained in this Note and/or the Other Loan Documents, including, but not limited to costs, environmental study fees, title search fees, reasonable paralegal fees and reasonable attorneys' fees, costs on any pretrial, trial, or appellate proceedings, or in any proceedings

3

under the United States Bankruptcy Code or in any post judgment proceedings, any sale costs, advertising costs and all other costs incurred.

10.   <u>WAIVER AND CONSENT.</u> Maker and each Obligor (defined to include jointly and severally each Maker, Borrower and party who executes the Note, any endorsers of this Note, sureties, all others who are or have been liable for any obligation evidenced and/or secured herein, and/or under the Other Loan Documents, and all of the foregoing parties, successors, heirs and assigns) does hereby, jointly and severally: (i) waive demand, presentment, protest, notice of demand, notice of presentment, notice of protest, notice of acceptance, notice of acceleration, notice of Event of Default, notices of any nature, including, but not limited to, notice of maturity and dishonor and nonpayment of this Note, and any other notice or further requirement necessary to hold each of them liable for payment; (ii) waive any right to immunity from any given action; (iii) consent to any forbearance or extension of the time or manner of payment hereof and to the release of all or any part of any security held by the Lender to secure payment of this Note; (iv) agree that the Lender may extend, modify or postpone the time and manner of payment and performance of this Note and any instrument securing this Note; (v) agree Lender may grant forbearance and may release, wholly or partially, any person or party primarily or secondarily liable with respect to this Note, all without notice to or consent by any party primarily or secondarily liable hereunder and without thereby releasing, discharging or diminishing its rights and remedies against any other party primarily or secondarily liable hereunder; (vi) agree that Lender may in its sole and absolute discretion seek recourse against any party responsible for any Liabilities without seeking recourse against any other such party; (vii) agree that any partial payment accepted by Lender (including any acceptance of any endorsed payment) shall never operate as satisfaction and/or an accord of the entire payment that is due or to be due; (viii) agree that no course of dealing or delay or omission or forbearance on the part of the Lender in exercising or enforcing any of its rights or remedies hereunder or under any instrument or under any of the Other Loan Documents shall impair or be prejudicial to any of the Lender's rights and remedies hereunder or to the enforcement hereof or under the Other Loan Documents; (ix) waives all requirements necessary to hold that party to the liability of that party; (x) waive any "venue privilege" and/or "diversity of citizenship privilege" which they have now or have in the future, and do hereby specifically agree, notwithstanding the provision of any state or federal law to the contrary, that the venue for the enforcement, construction or interpretation of this Note shall be the County Court, Circuit Court or Federal Court hereinafter provided and they do hereby specifically waive the right to sue or be sued in the court of any other county, any court in any other state or country or in any federal court, or in any state or federal administrative tribunal, and they further submit to the jurisdiction hereinafter provided; (xi) consent to any and all renewals in the time of payment hereof if agreed in writing by Lender; (xii) agree that at any time and from time to time, the terms of payment herein may be modified by signed agreement by Maker and Lender, without in any way affecting the Liability of any party to this instrument or any person liable or to become liable with respect to any indebtedness evidenced hereby and without any notice to said party; (xiii) agree that the dissolution or merger or consolidation or termination of the existence of any Maker that is a business entity (or if any person controlling such Maker

4

shall take any action authorizing or leading to the same) shall, at Lender's option, which option may be exercised then or at any time thereafter, result in the Note (and all principal and interest and any other monies due hereunder) being then due and payable in full, same further constituting an Event of Default hereunder; (xiii) agree that no provision of this Note shall limit Lender's right to serve legal process in any other manner permitted by law or to bring any such action or proceeding in any other competent jurisdiction; and (xiv) waive the right to plead any and all statutes of limitations as a defense to any demand on this Note, or any guaranty hereof, or any agreement to pay the same, or any and all obligations or liabilities arising out of or in connection with this Note, and the right to claim any set-off, counterclaim or deduction, to the fullest extent permitted by the law.

11.   <u>DOCUMENTARY STAMPS AND OTHER CHARGES.</u>  Documentary stamps or such other charges relative to this Note in the amount required by Florida Law have been purchased and affixed to the Mortgage of even date which secures this Note. However, if it is later determined that additional documentary stamps, intangible taxes or other such charges relative to this Note are required to be paid, Maker shall pay the same upon notice from Lender immediately.  Maker further agrees to pay all filing fees, intangible taxes, or other taxes which may apply to this Note.  Maker agrees to indemnify and hold Lender harmless from and against any liability, costs, attorney's fees, penalties, interest or expenses relating to any such taxes, as and when the same may be incurred.  Maker agrees to pay on demand, and to indemnify and hold Lender harmless from and against, any and all present or future taxes, levies, imposts, deductions, charges and withholdings imposed in connection with the Note by the laws or governmental authorities of any jurisdiction other than the State of Florida or the United States of America, and all payments to Lender under this Note shall be made free and clear thereof and without deduction therefor.

12.   <u>LATE CHARGE.</u>  If the Lender has not received the full amount of any monthly payment or any other payment due Lender hereunder by the end of ten (10) calendar days after the date it is due, Maker will pay a late charge to the Lender to cover the extra expense involved in handling delinquent payments.  The amount of the charge will be five (5%) percent of the overdue payment of principal and interest due immediately or $25.00, whichever is greater.  This late charge shall be in addition to any other remedies and rights hereunder.

13.   <u>MISCELLANEOUS.</u>

A.   The term "Maker" or "Obligor" or "Borrower", as used herein, in every instance shall include the Maker's, Obligor's and Borrower's heirs, executors, administrators, legal representatives, successors and assigns, and shall denote the singular and/or plural, the masculine and/or feminine, and natural and/or artificial persons whenever and wherever the context so requires or admits.

B.   The term "Lender" shall be deemed to include any subsequent holder(s) of this Note.  Whenever used in this Note, the term "person" means any

individual, firm, corporation, trust or other organization or association or other enterprise. Whenever used in this Note, words in the singular include the plural, words in the plural include the singular, and pronouns of any gender include the other genders, all as may be appropriate.

   C. "Business Day" means a day on which the office of the Lender at which payments under this Note are to be made is open for business.

   D. "Interest Period" means each period commencing on the last day of the immediately preceding Interest Period and ending on the same day of the month that interest is due one month thereafter; provided (i) the first Interest Period shall commence on the date hereof and end on the first day thereafter that interest is due, (ii) any Interest Period that ends in a month for which there is no day which numerically corresponds to the last day of the immediately preceding Interest Period shall end on the last day of the month and (iii) any Interest Period that would otherwise extend past the maturity date of this Note shall end on the maturity date of this Note.

   E. "LIBOR Business Day" means a day on which the office of the Lender at which payments under this Note are to be made is open for business and on which dealings in U.S. dollar deposits are carried out in the London interbank market.

   F. "London Interbank Offered Rate" means, with respect to any Interest Period, that rate for deposits in U.S. dollars for a period comparable to the term of such Interest Period which appears on Reuters Screen LIBOR01 (or such other page that may replace that page on that service or a successor service) as of 11:00 a.m., London, England time on the day that is two (2) LIBOR Business Days preceding the first day of such Interest Period (or if not so reported, then as determined by the Bank from another recognized source or interbank quotation).

   G. This Note may not be changed orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

   H. All payments made on the indebtedness evidenced by this Note shall be applied first to repayment of monies paid or advanced by Lender on behalf of the Maker in accordance with the terms of the Note, the Mortgage and/or under any of the Other Loan Documents, and thereafter shall be applied to payment of any attorneys' fees and costs incurred by Lender herein or under any of the Other Loan Documents including, but not limited to, those set forth under **paragraph 9** herein, then to payment of accrued interest and any other outstanding charges under this Note or under any of the Other Loan Documents, and lastly to payment of principal.

   I. This Note is executed under seal and constitutes a contract under the laws of the State of Florida and shall be governed by construed and enforceable in accordance with the laws of the State of Florida, and shall further be enforceable in a court

of competent jurisdiction in that state, regardless of in which state this Note is being executed. Jurisdiction for any legal action arising out of this Note shall lie in Pasco County, Florida or the Southern District of the State Florida.

     J.    The headings of the paragraphs contained in this Note are for convenience of reference only and do not form part hereof and in no way modify, interpret or construe the meaning of the parties hereto.

     K.    No extension of time for payment of this Note, or any installment hereof, and no alteration, amendment or waiver of any provision of this Note or of the Security Instruments made by agreement between Lender and any person or party shall release, discharge, modify, change or affect the liability of Maker under this Note. Lender shall not be deemed by any act or omission or commission to have waived any of its rights or remedies hereunder.

     L.    Any provision of this Note or the Other Loan Documents which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction only, be ineffective only to the extent of such prohibition or unenforceability without invalidating the remaining provisions (including the remaining provision set forth in the same section or paragraph containing the prohibited or unenforceable provision) hereof or affecting the validity or enforceability of such provision in any other jurisdiction. To the extent that Maker or any Obligor may lawfully waive any law that would otherwise invalidate any provision of this Note, each of them hereby waives the same, to the extent that this Note shall be valid and binding and enforceable against each of them in accordance with all its terms.

     M.    Lender shall not be deemed, by any act of omission or commission, to have waived any of its rights or remedies hereunder unless such waiver is in writing and signed by Lender, and then only to the extent specifically set forth in the writing. A waiver on one event shall not be construed as continuing or as a bar to or waiver of any right or remedy to a subsequent event.

     N.    Time shall be of the essence with respect to the terms of this Note. Maker shall receive immediate credit on payments if made in immediately available funds; otherwise, said payments shall be credited after clearance. Except as otherwise required by the provisions of this Note or any of the Other Loan Documents, any notice required to be given to any Maker shall be deemed sufficient if made personally or if mailed, postage prepaid, to such Maker's address as it appears in this Note (or, if none appears, to any address for such Maker then registered in Lender's records). All of the terms of this Note shall inure to the benefit of Lender and its successors and assigns and shall be binding upon Maker and each Obligor and their respective administrators, heirs, successors and assigns, jointly and severally.

     P.    This Note may be prepaid in whole or in part without penalty. However, any early termination of any Swap Agreement(s) may result in a payment to or require additional payment from Maker pursuant to the terms of the Swap Agreement.

Q.     MAKER HEREBY WAIVES ANY OBJECTION TO VENUE BEING IN COURTS LOCATED IN PASCO COUNTY, FLORIDA, FOR ANY DISPUTE ARISING OUT OF THIS NOTE.  MAKER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AGREE NOT TO SEEK A TRIAL BY JURY AND WAIVE ALL RIGHTS TO HAVE SAME IN RESPECT OF ANY LITIGATION (INCLUDING BUT NOT LIMITED TO ANY CLAIMS, CROSS-CLAIMS, THIRD PARTY CLAIMS) ARISING IN CONNECTION WITH THIS NOTE, THE OTHER LOAN DOCUMENTS, AND THE TRANSACTIONS CONTEMPLATED THEREIN AND ALL AND ANY COMBINATION OF THE FOREGOING.  MAKER ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THE LOAN EVIDENCED BY THIS NOTE BY, INTER ALIA, THE PROVISIONS OF THIS PARAGRAPH.

(SIGNATURES ON FOLLOWING PAGE)

TBG & CC RECREATION, LLC, a Florida limited
liability company

By: _____
Cora DiFiore, Manager

_____
Arthur Falcone

_____
Edward Falcone

TBG & CC RECREATION, LLC FEI #_____

Arthur Falcone's Social Security #_____

Edward Falcone's Social Security #_____

F:\wpdocs\LORRAINE\Regions Bank\TBGCC Loan\Promissory Note LIBOR Clean 2-11.doc

9

## Amortization Schedule- TBG & CC Recreation

| Principal Amount | Loan Commencement | First Payment Date | Maturity | Amortization (Years) | Interest Rate |
|---|---|---|---|---|---|
| $5,000,000.00 | 2/28/2008 | 3/27/2008 | 2/27/2013 | 15 | 6.49% |

Frequency
Monthly

Bank Location:
Bank No:

| Payment Numbers | Payment Date | Principal Payment | Remaining Principal |
|---|---|---|---|
| | 2/28/2008 | | $5,000,000.00 |
| 1 | 3/27/2008 | $17,952.94 | $4,982,047.06 |
| 2 | 4/27/2008 | $18,334.76 | $4,964,012.55 |
| 3 | 5/27/2008 | $18,157.29 | $4,945,855.26 |
| 4 | 6/27/2008 | $18,356.57 | $4,927,498.72 |
| 5 | 7/27/2008 | $19,283.44 | $4,908,415.49 |
| 6 | 8/27/2008 | $19,387.09 | $4,889,044.82 |
| 7 | 9/27/2008 | $16,851.41 | $4,872,693.47 |
| 8 | 10/27/2008 | $18,635.81 | $4,864,057.84 |
| 9 | 11/27/2008 | $19,632.23 | $4,838,437.84 |
| 10 | 12/27/2008 | $19,305.32 | $4,816,722.10 |
| 11 | 1/27/2009 | $19,291.90 | $4,797,841.80 |
| 12 | 2/27/2009 | $18,877.26 | $4,778,953.34 |
| 13 | 3/27/2009 | $18,962.43 | $4,760,100.61 |
| 14 | 4/27/2009 | $19,038.19 | $4,741,855.22 |
| 15 | 5/27/2009 | $19,197.34 | $4,721,912.98 |
| 16 | 6/27/2009 | $19,224.89 | $4,702,688.09 |
| 17 | 7/27/2009 | $19,210.85 | $4,683,278.24 |
| 18 | 8/27/2009 | $19,401.20 | $4,663,874.04 |
| 19 | 9/27/2009 | $19,489.98 | $4,644,484.06 |
| 20 | 10/27/2009 | $19,879.12 | $4,624,604.93 |
| 21 | 11/27/2009 | $19,648.70 | $4,604,226.24 |
| 22 | 12/27/2009 | $19,738.69 | $4,585,477.55 |
| 23 | 1/27/2010 | $19,849.29 | $4,565,628.47 |
| 24 | 2/25/2010 | $19,939.59 | $4,545,688.67 |
| 25 | 3/27/2010 | $20,031.12 | $4,525,657.45 |
| 26 | 4/27/2010 | $20,122.79 | $4,505,534.88 |
| 27 | 5/27/2010 | $20,214.92 | $4,485,319.87 |
| 28 | 6/27/2010 | $20,307.31 | $4,465,012.55 |
| 29 | 7/27/2010 | $20,400.21 | $4,444,612.36 |
| 30 | 8/27/2010 | $20,493.64 | $4,424,118.90 |
| 31 | 9/27/2010 | $20,587.30 | $4,403,531.60 |
| 32 | 10/27/2010 | $20,681.69 | $4,382,850.91 |
| 33 | 11/27/2010 | $20,776.17 | $4,362,073.91 |
| 34 | 12/27/2010 | $20,871.16 | $4,341,202.76 |
| 35 | 1/27/2011 | $20,966.64 | $4,320,236.11 |
| 36 | 2/27/2011 | $21,062.56 | $4,299,173.64 |
| 37 | 3/27/2011 | $21,158.83 | $4,278,014.82 |
| 38 | 4/27/2011 | $21,255.73 | $4,256,759.08 |
| 39 | 5/27/2011 | $21,302.87 | $4,235,456.22 |
| 40 | 6/27/2011 | $21,450.00 | $4,213,966.26 |
| 41 | 7/27/2011 | $21,548.00 | $4,192,498.44 |
| 42 | 8/27/2011 | $21,647.29 | $4,170,750.97 |
| 43 | 9/27/2011 | $21,744.42 | $4,149,012.86 |
| 44 | 10/27/2011 | $21,845.91 | $4,127,166.73 |
| 45 | 11/27/2011 | $21,943.84 | $4,105,222.35 |
| 46 | 12/27/2011 | $22,046.34 | $4,083,176.42 |
| 47 | 1/27/2012 | $22,147.02 | $4,061,027.60 |
| 48 | 2/27/2012 | $22,249.44 | $4,038,778.39 |
| 49 | 3/27/2012 | $22,356.22 | $4,016,408.52 |
| 50 | 4/27/2012 | $22,462.48 | $3,993,976.04 |
| 51 | 5/27/2012 | $22,555.20 | $3,971,421.14 |
| 52 | 6/27/2012 | $22,656.20 | $3,948,605.26 |
| 53 | 7/27/2012 | $22,762.96 | $3,926,008.99 |
| 54 | 8/27/2012 | $22,866.19 | $3,902,134.50 |
| 55 | 9/27/2012 | $22,970.80 | $3,880,163.69 |
| 56 | 10/27/2012 | $23,075.90 | $3,857,037.80 |
| 57 | 11/27/2012 | $23,181.47 | $3,833,906.33 |
| 58 | 12/27/2012 | $23,287.52 | $3,810,619.80 |
| 59 | 1/27/2013 | $23,394.06 | $3,787,224.74 |
| 60 | 2/27/2013 | $3,787,224.74 | |

# SCHEDULE A

(Estimated Schedule)

## FORBEARANCE AGREEMENT

This Forbearance Agreement (the "Agreement") is entered into effective as of March 27, 2009 by **Regions Bank** ("Lender"), **TBG & CC Recreation, LLC**, a Florida limited liability company, **Arthur Falcone** and **Edward Falcone**, jointly and severally (collectively, the "Borrower"), all of whom hereby stipulate and agree as follows:

WITNESSETH:

WHEREAS, Lender made a loan to Borrower ("Loan") as evidenced by that certain Promissory Note dated February 27, 2008 in the original principal amount of Five Million and No/100 Dollars ($5,000,000.00)("Note"); and

WHEREAS, the Note was secured by, among other things, that certain Mortgage and Security Agreement recorded February 28, 2008 in Official Records Book 7772, Page 953, of the Public Records of Pasco County, Florida, encumbering the real and personal property described therein (collectively, the "Mortgaged Property"); and

WHEREAS, the Note was further secured by that certain Collateral Assignment of Leases and Rents recorded in Official Records Book 7772, Page 1000 of the Public Records of Pasco County, Florida (the "Assignment") and by that certain UCC-1 Financing Statement recorded in Official Records Book 7772, Page 1018 of the Public Records of Pasco County, Florida (the "Financing Statement"), and other documents of even date therewith but unrecorded (the Assignment, Financing Statement and other documents hereinafter collectively referred to as "Loan Documents") which were executed simultaneously with the Mortgage;

WHEREAS, Borrower has asked Lender to defer six (6) consecutive payments of principal due under the Note commencing with the payment due March 27, 2009 and to pay interest only on the outstanding principal balance of the Note on each payment date; and

WHEREAS, Lender is willing to forbear any enforcement actions with respect to the Loan provided Borrower timely complies with all of the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the mutual covenants contained herein, the sum of TEN AND NO/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      The facts and recitals set forth above are true and correct and are incorporated herein by reference as if set forth in full.

2.      Lender agrees to forbear from instituting legal proceedings against Borrower until September 27, 2009, provided that Borrower complies with each and every term and condition of this Agreement. If any of the obligations under Paragraph 5 of this Agreement are not complied with, Lender shall have the immediate and unfettered right to commence any and all remedies available by law and in the Loan Documents. Under this Agreement, time is of the essence. Lender need not afford, and is not obligated to afford, Borrower any notice, grace periods or an opportunity to cure any default under this Agreement before Lender exercises its rights hereunder.



EXHIBIT "B"

3.      Borrower acknowledges that they have no defenses, rights of setoff or rights of recoupment to the claims that Lender has against them, and that Borrower has no claims, counterclaims or rescission rights against Lender arising out of, related to or pertaining to the promissory notes, mortgages, security agreements, assignments and guaranties, all as amended, modified, renewed or extended, or under any and all other lending documents of any kind or character, as amended, modified, restated, renewed or extended.

4.      Borrower acknowledges that, as of March 27, 2009, the outstanding principal balance of the Loan is $4,779,063.93.

5.      Lender shall refrain from instituting litigation against Borrower provided:

        a.      Lender's counsel receives this Agreement, fully executed by Borrower and notarized, on or before June 22, 2009; and

        b.      Borrower timely makes monthly payments of interest only on the outstanding principal balance of the Note commencing March 27, 2009 and continuing on the same day of each month thereafter until and including the payment due on August 27, 2009; and

        c.      Commencing with the payment due September 27, 2009, and continuing on the same day of each month thereafter, Borrower re-commences making payments of principal and interest in accordance with the terms of the Note; and

        d.      Borrower otherwise complies with all terms and conditions of the Loan Documents as modified hereby.

6.      Nothing in this Agreement shall be construed to extend the Maturity Date of the Note, and all of the principal payments deferred hereunder, along with all accrued and unpaid interest, shall be due and payable on the Maturity Date or on such earlier date as may be required under the Loan Documents.

7.      To induce Lender to enter into this Agreement, Borrower, for themselves and for each of their agents, attorneys, successors and assigns, release Lender and its predecessors, successors, assigns, officers, agents, directors, shareholders, affiliates and attorneys (collectively, "Affiliates"), jointly and severally from any and all claims, counterclaims, demands, damages, debts, agreements, covenants, suits, contracts, obligations, liabilities, accounts, offsets, rights, actions and causes of action for contribution and indemnity, whether arising at law or in equity (including without limitation, claims of fraud, duress, mistake, tortious interference, usury, or control), whether presently possessed or possessed in the future, whether known or unknown, whether liability be direct or indirect, liquidated or unliquidated, whether presently accrued or to accrue hereafter, whether absolute or contingent, foreseen or unforeseen, and whether or not heretofore asserted, for or because of or as a result of any act, omission, communication, transaction, occurrence, representation, promise, damage, breach of contract, fraud, violation of any statute or law, commission of any tort, or any other matter whatsoever or thing done, omitted or suffered to be done by Lender or any of its Affiliates, which has occurred in whole or in part, or was initiated at any time from the beginning of time up to and immediately preceding the moment of the execution of this Agreement.

2

8.     The invalidity, illegality or unenforceability of any provision of this Agreement, pursuant to judicial decree or otherwise, shall not affect the validity or enforceability of any other provision of this Agreement, each of which shall remain in full force and effect.

9.     No failure of any party to exercise any power given under this Agreement or to insist upon strict compliance with any of the terms or conditions specified in this Agreement shall constitute a waiver of such party's right to demand strict compliance with the terms of this Agreement or the Loan Documents.

10.     Nothing contained in this Agreement shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partners, joint venturers, or of any association whatsoever between Lender and Borrower other than the arms-length relationship of creditor and Borrower.

11.     This Agreement is intended by the parties as a final expression of their agreement with respect to the subject matter hereof and as a complete and exclusive statement of the terms and conditions thereof, superseding and replacing all prior negotiations between the parties hereto, or any of them, whether written or oral.  Any provision of this Agreement may be changed, waived or terminated only by written instrument signed by the party against whom the change, waiver, or termination is sought to be enforced.  Each of the parties to this Agreement acknowledges that no other party, or agent or attorney of any other party, has made any promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter hereof, to induce the other party to execute this Agreement or any of the other documents referred to herein, and each party to this Agreement acknowledges that it has not executed this Agreement or such other documents in reliance upon any such promise, representation or warranty not contained herein.  The parties to this Agreement acknowledge that all of the terms of this Agreement were negotiated at arm's length and that this Agreement and all documents executed in connection herewith were prepared and executed without undue influence of any kind exerted by any party upon any other party.

12.     This Agreement is not a novation of any of the existing Loan Documents.  The parties agree that except as modified herein, all terms conditions, rights and obligations under the Loan Documents shall otherwise remain in full force and effect as originally written and agreed.  To the extent that any provision of this Agreement conflicts with any provision contained in the Loan Documents, this Agreement shall prevail.  Upon default under this Agreement, Lender's obligation to forbear shall terminate and Lender may enforce the Loan Documents in accordance with their terms.

13.     This Agreement may be executed in several counterparts and all counterparts so executed shall constitute one agreement binding on all the parties hereto, notwithstanding that all the parties are not signatories to the original or the same counterpart.  If less than all parties sign this Agreement, or a counterpart, the agreement shall be effective against the signing parties.

14.     In the event any party hereto institutes legal proceedings in connection with, or for the enforcement of this Agreement or any provision hereof, the prevailing party shall be entitled to recover from the losing party its reasonable attorneys' fees and costs, at both trial and appellate levels.  Borrower further agrees to pay all of Lender's reasonable attorneys' fees and costs for the negotiation and documentation of this Forbearance Agreement.

15.    Lender and Borrower have sought independent legal advice by counsel of their own selection, or had the opportunity to seek such advice, prior to entering into this Agreement. The parties have executed this Agreement only after undertaking a thorough investigation and consideration of all the relevant facts and circumstances surrounding these claims.

16.    Should Borrower, or any of them, file for bankruptcy during the term of this Agreement, the Agreement shall be in default and Lender's obligation to forbear shall terminate. Lender shall be entitled to the immediate lifting of the automatic stay in any bankruptcy proceedings and Borrower consents to relief from the automatic stay and acknowledges that the value of the subject collateral does not exceed the amount of Lender's lien thereon together with all other liens thereon.

17.    LENDER AND BORROWER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE NOTES, LOAN, MORTGAGES, SECURITY AGREEMENTS, ASSIGNMENTS, GUARANTIES, LOAN AGREEMENTS, OTHER LOAN DOCUMENTS, THIS FORBEARANCE AGREEMENT OR ANY DOCUMENT CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTION OF BORROWER OR LENDER. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER ENTERING INTO THIS FORBEARANCE AGREEMENT.

Dated: June 22, 2009.

BORROWER:

TBG & CC RECREATION, LLC, a Florida limited liability company

By: _____
    Cora DiFiore, Manager

_____
Arthur Falcone

_____
Edward Falcone

4

STATE OF FLORIDA                    )
                                    ) ss:
COUNTY OF Palm Beach                )

I hereby certify that the foregoing instrument was acknowledged before me this 22ᵗʰ day of June, 2009, by Cora DiFiore as Manager of TBG & CC Recreation, LLC, a Florida limited liability company, who is personally known to me or has produced _____ as identification and did (did not) take an oath.

_____
Notary Public, State of Florida
My Commission Expires:

(SEAL)

EILEEN CANAVAN
MY COMMISSION # DD 469102
EXPIRES: September 7, 2009
(Bonded Thru Notary Public Underwriters)

STATE OF FLORIDA                    )
                                    ) ss:
COUNTY OF Palm Beach                )

I hereby certify that the foregoing instrument was acknowledged before me this 22ᵗʰ day of June, 2009, by   Arthur   Falcone,   who   is   personally   known   to   me   or   has   produced _____ as identification and did (did not) take an oath.

_____
Notary Public, State of Florida
My Commission Expires:

(SEAL)

EILEEN CANAVAN
MY COMMISSION # DD 469102
EXPIRES: September 7, 2009
Bonded Thru Notary Public Underwriters

STATE OF FLORIDA                    )
                                    ) ss:
COUNTY OF Palm Beach                )

I hereby certify that the foregoing instrument was acknowledged before me this 3ᵈ day of June, 2009, by   Edward   Falcone,   who   is   personally   known   to   me   or   has   produced _____ as identification and did (did not) take an oath.

_____
Notary Public, State of Florida
My Commission Expires:

(SEAL)

EILEEN CANAVAN
MY COMMISSION # DD 469102
EXPIRES: September 7, 2009
Bonded Thru Notary Public Underwriters

5

LENDER:

REGIONS BANK

By: _____

David Jackson, Senior Vice President

STATE OF FLORIDA
COUNTY OF PALM BEACH

The foregoing instrument was acknowledged before me this _15t_ day of ~~June~~ July, 2009 by David Jackson as Senior Vice President of Regions Bank, on behalf of the Bank, ~~who is personally known to me~~ OR produced _Drivers license_ as identification and who did not take an oath.

_____
Notary Public, State of Florida
My Commission Expires:

(SEAL)

EILEEN CANAVAN
MY COMMISSION # DD 469102
EXPIRES: September 7, 2009
Bonded Thru Notary Public Underwriters

6

STATE OF FLORIDA      )

COUNTY OF _Palm Beach_      ) ss:
                        )

I hereby certify that the foregoing instrument was acknowledged before me this _22nd_ day of _June_, 2009, by Cora DiFiore as Manager of TBG & CC Recreation, LLC, a Florida limited liability company, who is personally known to me or has produced _____ as identification and did (did not) take an oath.

_Eileen Canavan_

Notary Public, State of Florida
My Commission Expires:

(SEAL)

EILEEN CANAVAN
MY COMMISSION # DD 469102
EXPIRES: September 7, 2009
Bonded Thru Notary Public Underwriters

STATE OF FLORIDA      )

COUNTY OF _Palm Beach_      ) ss:
                        )

I hereby certify that the foregoing instrument was acknowledged before me this _22nd_ day of _June_, 2009, by Arthur Falcone, who is personally known to me or has produced _____ as identification and did (did not) take an oath.

_Eileen Canavan_

Notary Public, State of Florida
My Commission Expires:

(SEAL)

EILEEN CANAVAN
MY COMMISSION # DD 469102
EXPIRES: September 7, 2009
Bonded Thru Notary Public Underwriters

STATE OF FLORIDA      )

COUNTY OF _Palm Beach_      ) ss:
                        )

I hereby certify that the foregoing instrument was acknowledged before me this _30_ day of _June_, 2009, by Edward Falcone, who is personally known to me or has produced _____ as identification and did (did not) take an oath.

_Eileen Canavan_

Notary Public, State of Florida
My Commission Expires:

(SEAL)

EILEEN CANAVAN
MY COMMISSION # DD 469102
EXPIRES: September 7, 2009
Bonded Thru Notary Public Underwriters

2

Regions Bank
## AMENDMENT/EXCEPTION FORM

| | |
|---|---|
| Area/Department: | C&I- Palm Beach |
| RM: | David Jackson |
| Borrower: | TBG & CC Recreation, LLC/Arthur Falcone/Edward Falcone |
| Obligor/Obligation: | 2580030935 / 0001169937 |
| Total Exposure: | $5,155,813 |
| Total Commitment Amount: | $5,155,813 |
| Outstanding Amount: | $5,155,813 |
| Original Maturity Date: | |
| Number of Extensions Since Maturity: | |
| Last Extension Maturity Date: | |
| Current Maturity Date: | 02/27/2013 |
| New Note Needed? | Yes ● No |

Exception Extension: Current # of Days:   Days Extended:   Extension Expiration Date:

Obligor Risk Rating (Attach Internal Risk Rating Model): 70

If Obligor Rating has changed, what was previous rating? 49

Triggers up:

Triggers down:

1. Exception to Policy and Reason(s) Why:

Reason:

2. Amendments, Modification, or Waiver:

Request to modify the original loan agreement on the term loan (obligation # 0001169937) by deferring principal for 6 months related to the March, April, May, June, July, and August payments

Reason:

A complete and detailed Risk Rating Change Form dated 05/15/09 was approved and prepared in conjunction with this A&E. Refer to the attached Risk Rating Change for more details.

3. Fee Charged:

4. Facility  RAROC:

5. Management/Committee:

6. Risk Rating Accuracy: (Does this change/impact the Borrower's risk rating?)

No impact on Risk Rating

7. Does this A&E trigger one of the tracked exceptions?

Yes     ● No     ◌ N/A – Special Assets

Is this a high-risk customer?   ◌ Yes ● No
Is there a new guarantor? ◌ Yes ● No
Is there a signer that is not on Level 3? ◌ Yes ● No

Approvals Required (Authorized Signature and Date):

| | | |
|---|---|---|
| Sales Manager<br>Area Credit Officer | X Senior Credit Officer<br>Area Executive | Corporate Credit Committee |

| | | |
|---|---|---|
| Relationship Manager: | David Jackson | Date: 5/29/09 |
| Senior C.O.: | Trudy Carrodeguas | Date: 5/29/09 |
| Sales Manager: | | Date: |
| Area C.O.: | | Date: |
| Area Executive: | | Date: |
| Corporate Credit Committee: | | Date: |

TBG & CC Recreation, LLC/Arthur Falcone/Edward Falcone

## RISK RATING CHANGE FORM / CHARGE OFF / NON ACCRUAL

| | |
|---|---|
| Relationship/Obligor Name: | TBG & CC Recreation, LLC/Arthur Falcone/Edward Falcone |
| Bank Number/Obligor Number: | 92 / 2580030935 |
| SIC Code: | 7997 |
| Name of Region/Regional Manager: | South Florida / Angel Medina |
| LOB/Place of Origination: | CSI / Palm Beach, FL |
| Current Relationship Manager: | David Jackson |
| Total Credit Commitment: | $5,155,813 |
| Date Form Completed: | 05/15/2009 |
| | Month to be processed: Month:May Year: 2009 |

Type of Loan:   X Level III            Leasing            Other

Request:   X Obligor Risk Rating Change    Charge Off    Non-Accrual    Re-Accrual

Obligor Risk Rating:   49 Current Obligor Risk Rating         70 New Obligor Risk Rating

Management Attention:   Yes ● No

Triggers Up:   6-month principal deferment period to allow for a possible ownership transfer of the Club facilities to the HOA- No ORR upgrade is anticipated during the principal deferment period (see below for more details)

Triggers Down:   Possible Transfer to SAD (see below for more details)

OBLIGOR RISK RATING CHANGE INFORMATION ONLY

(Reference Commercial Loan Policy, Section 900-4, to determine what approvals are needed. Please attach Moody's IRRM and Level III 0105 screen)

| Bank # | Customer / Obligor # | Loan / Obligation # | Original Loan Amount | Current Balance | Maturity Date | Collateral Description | Collateral Value | Appraisal Date |
|---|---|---|---|---|---|---|---|---|
| 92 | TBG & CC Recreation, LLC/Arthur Falcone/Edward Falcone / 2580030935 | Term Loan / 0001160932 | $5,000,000 | $4,779,004 | 02/27/2013 | First Mortgage on 178 acres improved with an 18-hole semi-private golf course and a 9-hole executive golf course known as Tampa Bay Golf & Country Club, 8 asstd. board courts, a tennis court, a 15M sq-ft clubhouse incl. a pro shop, a 7M sq-ft community center, and maintenance facilities in Pasco County, FL. | $7,305,000 | 11/20/07 |
| 92 | TBG & CC Recreation, LLC/Arthur Falcone/Edward Falcone / 2580030935 | Swap / 0001177874 | $275,271 | $376,749 | 02/27/2013 | same as above | same as above | same as above |

SUPPORTING COMMENTS.

Tampa Bay Golf and Country Club LLC (TBG) was purchased by Arthur and Edward Falcone in 2005 and represents 178 acres improved with an 18 and a 9-hole golf course, a 15,000 sq. ft. clubhouse, pro shop, a 7,000 sq. ft. community center, and maintenance facilities in San Antonio, Pasco County, Florida. There are currently approx. 1,250 residences in the TBG Community. $113 of the homeowners' monthly HOA dues are dedicated to the Golf and Country Club regardless of whether or not the homeowner uses the golf facilities. The Club and the Community have a contractual agreement with regard to the $113/mth/homeowner club membership dues.

The term loan was originated on 02/27/08. As mentioned in the original LAF, the 31 ORR was predicated on the individual borrowers' strength using the Private Banking Model. Per the original LAF, the individual borrowers' strength represents the primary interim repayment source until the country club can cash flow the debt with a minimum DSC of 1.0X based on the FYE 08 numbers. The DSC covenant of 1.0X is to be initially tested based on FYE 08 numbers. The borrower provided the Club's company-prepared FYE 08 statements, which revealed a net loss of $182M, EBITDA of -$114M, and a DSC of -0.36X. The Club still does not have the repayment capacity to service the debt and continues to rely on the individual borrowers' income and liquidity. Along with the downgrade, a waiver of the DSC based on 08 is requested, but the DSC covenant will not be reset.

At the time of the original credit write-up, the individual borrowers reported combined liquidity and net worth of $120MM and $798MM, respectively, per the PFSs dated 09/30/07. Updated PFSs as of 12/31/08 were provided by Edward and Arthur Falcone, which revealed a significant deterioration in their overall personal financial position. As of 12/31/08, combined liquidity and net worth declined to $26MM and $41MM, respectively. The combined personal liquidity position decreased significantly due to the fact that the individual borrowers have had to subsidize their real estate holding companies (operating expenses and debt service) over the year. These real estate holding companies mainly represent large tracts of non-income producing vacant land encumbered by a significant amount of debts.

In fact, the borrower also provided a detailed schedule of the Falcones' real estate investments. The schedule delineates 43 real estate holding companies/projects representing vacant land, homebuilding projects, and commercial properties (including TBG). Total debts associated with these real estate holding companies amount to approx. $583MM of which $393MM are guaranteed by Edward and Arthur Falcone. Per their 2007 1040 tax returns, combined income from wages, interest and dividend income, and capital gains were approx. $46MM and combined pass-thru losses from the real estate holding companies were approx. $150MM.

The term loan is currently past due for the April and May loan payments. At the end of April 2009, the CFO, John Chisto, informed the RM that they were not going to make the payments and asked to meet to discuss the loan. The RM notified the CFO that the loan is in default, and the CFO stated that the Falcones are in a workout situation with 90% of their lenders at this time. At that point, a risk rating change form was approved on 04/22/09 to downgrade the relationship from a 31 to a 49 (with management attention) pending a meeting with the client. On 04/30/09, both the RM and City President met with the client to discuss a plan of action. The client explained that their ultimate objective is to transfer the ownership of the Club to the Community in 30 to 90 days as the Falcones no longer wish to own and manage the facilities. The client also provided the aforementioned schedule of the Falcones' real estate investments and contingent liabilities.

After further discussions with the client and Capital Markets regarding the swap and considering the expected ownership transfer of the Club to the HOA, a workout plan is being proposed that will include a 6-month principal deferment from April to September of 2009. The RM feels that a more realistic time frame would be 6-12 months. The client has agreed to cover the past due interest and the late fees and to make interest-only payments during the deferment period if the workout plan is approved.

A downgrade to a 70 is recommended based on the cash flow deficiencies of the Club as reflected by the -0.36X DSC for 08, the deterioration noted in the individual borrowers' financial position, the Falcones' $393MM in contingent liabilities primarily related to non-income producing properties, and the Falcones' current workout plan with 90% of their lenders. However, considering the fact that the short-term expectation is to transfer the ownership of the Club facilities to the HOA and upon approval of the principal deferment, the client will cover the interest payments, the RM and the Underwriter also recommend that the client be monitored and managed by the line of business and not be transferred to SAD immediately.

Management of the relationship by the line of business during the principal deferment period is contingent upon the following: 1) the client makes the monthly interest-only payments on time as agreed 2) the client remains responsive and cooperative, and 3) the client can demonstrate to the bank that they are actively engaging the HOA to facilitate and complete the ownership transfer. On a monthly basis starting June 1st, the RM and Underwriter will reach out to the client in order to get an update on the transfer and to gather evidence (ex. email communications, letters, faxes...) of The Falcone Group's active participation in the transfer process.

## APPROVALS

| | | | |
|---|---|---|---|
| Relationship Manager: | David Jackson | | 5/8/08 |
| | (Print Name) | (Signature) | (Date) |
| Sales Manager / City President / Team Leader: | Tammi Calvo-Sanchez | | |
| | (Print Name) | (Signature) | (Date) |
| Area Credit Officer: | Trudy Carrodeguas | | 5/15/08 |
| | (Print Name) | (Signature) | (Date) |
| Senior Credit Officer: | Roland Gagnon | | 5/18/09 |
| | (Print Name) | (Signature) | (Date) |
| Area Executive: | | | |
| | (Print Name) | (Signature) | (Date) |
| Regional President: | | | |
| | (Print Name) | (Signature) | (Date) |
| SAD Region Manager: | Scott Corrigan | | 5/21/07 |
| | (Print Name) | (Signature) | (Date) |
| SAD Credit Officer: | | | |
| | (Print Name) | (Signature) | (Date) |
| Head of SAD: | | | |
| | (Print Name) | (Signature) | (Date) |
| Commercial Credit Executive: | | | |
| | (Print Name) | (Signature) | (Date) |
| Chief Credit Officer: | | | |
| | (Print Name) | (Signature) | (Date) |



**Gavin S. Banta, Esq.**
Email: gsb@angelolaw.com

February 12, 2010

**VIA FEDERAL EXPRESS AND U.S. CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
#   7009 0080 0000 6992 2448
TBG & CC Recreation, LLC
1951 N.W. 19th Street, Suite 200
Boca Raton, Florida 33431
Attn: Ms. Cora DiFiore

**VIA FEDERAL EXPRESS AND U.S. CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
#   7009 0080 0000 6992 2455
Arthur Falcone
1951 N.W. 19th Street, Suite 200
Boca Raton, Florida 33431

**VIA FEDERAL EXPRESS AND U.S. CERTIFIED MAIL, RETURN RECEIPT REQUESTED**
#   7009 0080 0000 6992 2462
Edward Falcone
1951 N.W. 19th Street, Suite 200
Boca Raton, Florida 33431

Re:     Loan in the original principal amount of $5,000,000.00 (the "Loan") to TBG & CC Recreation, LLC, a Florida limited liability company ("TBG"), Arthur Falcone ("Arthur") and Edward Falcone ("Edward") (TBG, Arthur & Edward are collectively referred to as the "Borrower") from Regions Bank (the "Bank")

Dear Ms. DiFiore, Mr. Falcone and Mr. Falcone:

Please be advised this law firm represents the Bank in regard to the above-referenced Loan.

Reference is made to that certain Promissory Note dated February 27, 2008, made by Borrower to the order of the Bank in the original principal amount of $5,000,000.00 (the "Note"). The Note is secured, in part, by that certain Mortgage and Security Agreement dated February 27, 2008 from TBG in favor of Bank, recorded in Official Records Book 7772, Page 953, of the Public Records of Pasco County, Florida (the "Mortgage"). Reference is also made to that certain Forbearance Agreement dated as of March 27, 2009, by and among Borrower and Bank (the "Forbearance Agreement"). The Note, the Mortgage, the Forbearance Agreement, and all other loan documents executed by Borrower in connection therewith are hereafter collectively referred to as the "Loan Documents". Terms not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Documents.

Pursuant to the terms of the Note, the Borrower is required to make to the Bank monthly payments of principal and interest. Borrower requested Bank defer six (6) consecutive payments of principal due under the Note commencing with the payment due March 27, 2009 and to pay interest only on the

**EXHIBIT "C"**



outstanding principal balance of the Note on each payment date. Pursuant to the terms of the Forbearance Agreement, the Bank agreed to defer the principal payments provided Borrower timely made all interest payments commencing on March 27, 2009 and continuing on the same day of each month thereafter until and including the payment due on August 27, 2009. Borrower has failed to make (i) the monthly interest payments due on July 27, 2009 and August 27, 2009 under the Note and Forbearance Agreement, and (ii) the monthly payments of principal and interest due on September 27, 2009 and thereafter. Failure to pay such sums within ten (10) days of their respective due date constituted Events of Default under the Note.

As of February 12, 2010, the following amounts were fully due under the Note, the Mortgage, and applicable Loan Documents:

| | |
|---|---|
| Principal: | $ 4,779,063.93 |
| Past Due Interest through February 12, 2010: | $    53,658.52 |
| | |
| TOTAL AMOUNT DUE | |
| As of February 12, 2010 | **$ 4,832,722.45*** |

* This total does not include attorneys' fees, late charges, sums due under any swap agreement, or default interest that may be incurred and due under the Loan Documents, and additional interest which will continue to accrue. The Bank continues to reserve the right to accrue interest at the Default Rate (as defined in the Note) as provided in the Note and Loan Documents.

As a result of the foregoing Events of Default, the Bank is entitled to declare, and hereby does declare the entire unpaid principal sum to be immediately due and payable. Demand is hereby made for payment of all principal, interest and other sums due under the Note, Forbearance Agreement and the Loan Documents. Please be advised that any failure to make prompt and proper payment arrangements by 5:00 PM, February 26, 2010 for all sums due as described above to Regions Bank, 2800 Ponce de Leon - 7th Floor, attn. J. Patrick Carrigan, Coral Gables, FL 33134 may result in pursuit by the Bank of all legal remedies.

Any omission in demanding a remedy currently available is in no circumstance a waiver or release of any remedy and cannot be relied upon by you as such. Further, any demand for interest in excess of that allowable under applicable law is unintentional, and, upon discovery, will be credited toward payment of principal due, or refunded, if payment in full is received.

At no time shall any prior or subsequent course of conduct by the Borrower or the Bank directly or indirectly limit, impair or otherwise adversely affect any of the Bank's rights, interests or remedies in connection with the Loans and the Loan Documents or obligate the Bank to agree to, or to negotiate, or consider an agreement to, any waiver of any obligation or default by the Borrower or under any of the Loan Documents or any amendment to any term or condition of any Loan Document.

Further, nothing in this letter or in the Bank's application of any subsequent payments is or shall be deemed to be a waiver, election or estoppel of any rights, under any applicable laws and/or in equity in connection with any Event of Default or any other default by the Borrower, and the Bank expressly reserves all such rights, remedies, defenses and objections, including with respect to any defaults now or hereafter in existence, whether known or unknown, to the Bank.

PLEASE BE GOVERNED ACCORDINGLY.

Sincerely,

Gavin S. Banta

cc:      Regions Bank

3

(Local Currency—Single Jurisdiction)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

Dated as of February 15, 2008

REGIONS BANK             and             TBG & CC RECREATION, LLC
                                         ARTHUR FALCONE, and
                                         EDWARD FALCONE

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

1      **Interpretation**

(a)     *Definitions*. The terms defined in Section 12 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency*. In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement*. All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2      **Obligations**

(a)     *General Conditions*.

(i) Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright ©1992 by International Swap Dealers Association, Inc.

Second Printing



(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable: —

(i)    in the same currency; and

(ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of branches or offices through which the parties make and receive payments or deliveries.

(d)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.    **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into) that:—

(a)    *Basic Representations*.

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

2

ISDA®1992
Second Printing

(iv)  *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)  *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)  *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)  *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)  *Accuracy of Specified information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)  *Furnish Specified Information*. It will deliver to the other party any forms, documents or certificates specified in the Schedule or any Confirmation by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)  *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)  *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

**5.    Events of Default and Termination Events**

(a)  *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)  *Failure to Pay or Deliver*. Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)  *Breach of Agreement*. Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(d) or to give notice of a Termination Event) to be complied with or performed

ISDA®1992
Second Printing

by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii) *Credit Support Default.*

(1) Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2) the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3) the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv) *Misrepresentation.* A representation made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v) *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi) *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its

ISDA®1992
Second Printing

winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1)   the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)   the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)      *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (ii) below or an Additional Termination Event if the event is specified pursuant to (iii) below:—

(i)   *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1)   to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2)   to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii)   *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(iii) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event*.

(i)    *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iii)    *Right to Terminate*. If: —

(1)    an agreement under Section 6(b)(ii) has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)an Illegality other than that referred to in Section 6(b)(ii), a Credit Event Upon Merger or an Additional Termination Event occurs,

either party in the case of an Illegality, any Affected Party in the case of an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation*.

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

ISDA®1992
Second Printing

(ii)  Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(d) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)  *Calculations.*

(i)  *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)  *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment), from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)  *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)  *Events of Default.* If the Early Termination Date results from an Event of Default:—

(1)  *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party over (B) the Unpaid Amounts owing to the Defaulting Party.

(2)  *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)  *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Unpaid Amounts owing to the Non-defaulting Party less (B) the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative

ISDA®1992
Second Printing

number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) *Termination Events*. If the Early Termination Date results from a Termination Event:—

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties:—

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Unpaid Amounts owing to X less (II) the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:—

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void

ISDA®1992
Second Printing

8.  **Miscellaneous**

(a)  *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)  *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)  *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)  *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)  *Counterparts and Confirmations*.

   (i)  This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

   (ii)  The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)  *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)  *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

9.  **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

10.  **Notices**

(a)  *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

   (i)  if in writing and delivered in person or by courier, on the date it is delivered;

   (ii)  if sent by telex, on the date the recipient's answerback is received;

ISDA®1992
Second Printing

(iii)  if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)  if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)  if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

## 11.     Governing Law and Jurisdiction

(a)     *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably: —

(i)     submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 12.     Definitions

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

ISDA®1992
Second Printing

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:—

(a)   in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)   in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)   in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)   in all other cases, the Termination Rate.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date determined in accordance with Section 6(a) or 6(b)(iii).

"*Event of Default*" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"*Illegality*" has the meaning specified in Section 5(b).

"*law*" includes any treaty, law, rule or regulation and "*lawful*" and "*unlawful*" will be construed accordingly.

"*Local Business Day*" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"*Loss*" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position ( or any gain

ISDA®1992
Second Printing

resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 9. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"*Market Quotation*" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under

ISDA®1992
Second Printing

this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"**Settlement Amount**" means, with respect to a party and any Early Termination Date, the sum of:—

(a)   the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)   such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"**Specified Entity**" has the meaning specified in the Schedule.

"**Specified Indebtedness**" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"**Specified Transaction**" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"**Terminated Transactions**" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"**Termination Event**" means an Illegality or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"**Termination Rate**" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"**Unpaid Amounts**" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall  be reasonably determined

ISDA®1992
Second Printing

by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

REGIONS BANK

By:    .................................................

Name:    Jason Maxwell

Title:    Senior Vice President

Date:    2-19-08

TBG & CC RECREATION, LLC

By:    .................................................

Name:    Cora DiFiore

Title:    Manager

Date:

ARTHUR FALCONE

.................................................

Date:

EDWARD FALCONE

.................................................

Date:

14

**ISDA®1992**

Second Printing

SCHEDULE to the
MASTER AGREEMENT

dated as of February 15, 2008

between
REGIONS BANK,
an Alabama state banking corporation ("Party A")
and
TBG & CC RECREATION, LLC,
a Florida limited liability company,
ARTHUR FALCONE, an individual residing in the State of Florida,
and EDWARD FALCONE, an individual residing in the State of Florida,
(collectively referred to herein as "Party B")

Part 1 Termination Provisions

In this Agreement

(a)  **"Specified Entity"** means in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v): | Any Affiliate of Party B |
| Section 5(a)(vi): | Any Affiliate of Party B |
| Section 5(a)(vii): | Any Affiliate of Party B |
| Section 5(b)(ii): | Any Affiliate of Party B |

(b)  **"Specified Transaction"** will have the meaning specified in Section 12 of this Agreement.

(c)  The **"Cross Default"** provisions of Section 5(a)(vi) of this Agreement will apply only to Party B and any Credit Support Provider or any applicable Specified Entity of Party B. The definition of the term "Specified Indebtedness" is amended and restated in its entirety to read as follows:

> **"Specified Indebtedness"** means: (i) all obligations for borrowed money or evidenced by bonds, debentures, notes or similar instruments; (ii) all obligations for the deferred purchase price of property or services; (iii) all capitalized lease obligations; (iv) all obligations of others secured by a lien on any property of such party (whether or not any such obligations have been assumed by such party or guaranteed by such party); (v) all obligations of others guaranteed by such party; (vi) all obligations of such party, contingent or otherwise, in respect of any letters of credit or bankers' acceptances; and (vii) all obligations under any Derivative Transaction.

> As used in the foregoing definition, the term **"Derivative Transaction"** means: (a) any transaction (including an agreement with respect thereto) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, credit derivative transaction, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions); and (b) any combinations of these transactions.

> **"Threshold Amount"** means, with respect to Party B, $0.

(d)  The **"Credit Event Upon Merger"** provisions of Section 5(b)(ii) will apply only to Party B and, if such event occurs with respect to any Credit Support Provider or applicable Specified Entity of Party B, such event will be deemed to have occurred with respect to Party B.

(e)  The **"Automatic Early Termination"** provision of Section 6(a) will not apply to either party.

(f) **Payments on Early Termination.** For the purpose of Section 6(e) of this Agreement: (i) Market Quotation will apply; and (ii) Second Method will apply.

(g) **"Additional Termination Event"** will apply. For the purpose of Section 5(b)(iii) of this Agreement, it shall be an "Additional Termination Event" with Party B being the sole Affected Party if (i) the loan or other indebtedness in connection with which a Transaction is entered into by Party B for the purpose or with the effect of altering the net combined payment of Party B from a floating to fixed or a fixed to floating rate basis is repaid, whether upon acceleration of principal, at maturity, or otherwise, or for any other reason ceases to be an obligation of Party B, with or without the consent of Party A, or (ii) any Credit Support Document expires, terminates, or ceases to be in full force and effect for the purpose of this Agreement unless this Agreement is expressly amended in writing to reflect that it is no longer a Credit Support Document hereunder.

### Part 2 Agreement to Deliver Documents

For the purpose of Section 4(a), Party B agrees to deliver to Party A:

| Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|
| A Borrowing Authorization satisfactory to Party A, substantially in the form attached hereto as Exhibit A | At execution of this Agreement and the Confirmation of the first Transaction and, if requested by Party A, as soon as practicable after execution of any Confirmation of any subsequent Transactions | Yes |
| Annual financial statements and quarterly financial statements of Party B and of any Credit Support Provider or Affiliate of Party B as required to be delivered pursuant to the Financial Agreement, or if no Financial Agreement is in effect, then as reasonably requested by Party A from time to time | Promptly following demand by Party A | Yes |
| Credit Support Documents (if applicable) | At execution of this Agreement | Yes |

### Part 3 Miscellaneous

(a) *Addresses for Notices.* For the purpose of Section 10(a) of this Agreement, all notices to a party shall, with respect to any particular Transaction, be sent to its address or facsimile number specified in the relevant Confirmation (or as specified below if not specified in the relevant Confirmation), provided that any notice under Section 5 or 6 of this Agreement, and any notice under this Agreement not related to a particular Transaction, shall be sent to a party at its address specified below:

Address for notices or communications to Party A:

| | |
|---|---|
| Address: | Regions Bank |
| | 1900 5th Avenue North |
| | 17th Floor |
| | Birmingham, Alabama 35203 |
| Attention: | Carl Taube |
| Telephone No.: | (205) 264-7410 |
| Facsimile No.: | (205) 326-7852 |

Address for notices or communications to Party B:

| Address: | 1951 NW 19th Street, Suite 200 |
| | Boca Raton, Florida 33431 |
| Attention: | Jon Ginsberg |
| Telephone No.: | (561) 961-1234 |
| Facsimile No.: | (561) 338-2957 |

(b)   **Calculation Agent.** The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(c)   **Credit Support Document.** Details of any Credit Support Document: In relation to Party A, none.  In relation to Party B, that certain mortgage, security agreement or other similar document made by Party B or any entity or individual comprising Party B in favor of Party A, and each other document which by its terms secures, guarantees or otherwise supports Party B's obligations hereunder from time to time, whether or not this Agreement, any Transaction, or any type of Transaction entered into hereunder is specifically referenced or described in any such document.

(d)   **Credit Support Provider.** Credit Support Provider means in relation to Party A, none. Credit Support Provider means in relation to Party B, each person party to a Credit Support Document that provides or is obligated to provide security, a guaranty or other credit support for Party B's obligations hereunder, whether or not this Agreement, any Transaction, or any type of Transaction entered into hereunder is specifically referenced or described in any such document.

(e)   **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(f)   **Netting of Payments.** If payments are due by each party on the same day under two or more Transactions, then Section 2(c)(ii) will not apply to those payments if a party gives notice to the other party on or before the second New York Business Day before that payment date stating that those payments will be netted or, if given by the Calculation Agent, stating the net amount due.

(g)   **Affiliate** will have the meaning specified in Section 12 of this Agreement.

## Part 4 Other Provisions

(a)   **2000 ISDA Definitions.** This Agreement and each Transaction are subject to the 2000 ISDA Definitions (including its Annex) published by the International Swaps and Derivatives Association, Inc. (together, the "Definitions") and will be governed by the provisions of the Definitions.  The provisions of the Definitions are incorporated by reference in, and shall form part of, this Agreement and each Confirmation.  Any reference to a "Swap Transaction" in the Definitions is deemed to be a reference to a "Transaction" for purposes of this Agreement or any Confirmation.  The provisions of this Agreement (exclusive of the Definitions) shall prevail in the event of any conflict between such provisions and the Definitions.

(b)   **Confirmations.** Notwithstanding anything to the contrary in the Agreement:

   (1)   The parties hereto agree that with respect to each Transaction hereunder a legally binding agreement shall exist from the moment that the parties hereto agree on the essential terms of such Transaction, which the parties anticipate will occur by telephone.

   (2)   For each Transaction Party A and Party B agree to enter into hereunder, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction.  Party B shall execute and return the Confirmation to Party A or request correction of any error within three (3) Local Business Days of receipt. Unless Party B objects to the terms within three (3) Local Business Days after receipt of that Confirmation, those terms shall be deemed accepted and correct absent manifest error, in which case that Confirmation will be sufficient to form a binding supplement to this Agreement notwithstanding Section 8(e)(ii) of this Agreement.  Failure by Party A to send a Confirmation or of Party B to respond within such period shall

not affect the validity or enforceability of such Transaction.

(c)    **Consent to Recording.** Each party and any of its Affiliates may electronically record any of its telephone conversations with the other party or with any of the other party's Affiliates in connection with this Agreement or any Transaction (or any potential Transaction), and any such recordings may be submitted in evidence in any proceeding to establish any matters pertinent to this Agreement or any Transaction (or any potential Transaction).

(d)    **Setoff.** Section 6 of the Agreement is hereby amended by adding the following Section 6(f):

> "(f)  **Setoff.** Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments under this Agreement will be made without setoff or counterclaim; provided, however, that upon the designation of any Early Termination Date, in addition to and not in limitation of any other right or remedy (including any right to setoff, counterclaim or otherwise withhold payment) under applicable law, the Non-defaulting Party will have the right to setoff, counterclaim or withhold payment of any matured or unmatured obligation under this Agreement or any other agreement between the parties against any matured or unmatured payment or performance obligation of the Defaulting Party under this Agreement or any other agreement between the parties or their Affiliates, and if any sum or obligation is unascertained, the Non-defaulting Party may in good faith estimate that sum or obligation and set off in respect of such estimate, subject to an accounting by the Non-defaulting Party when such sum or obligation is ascertained and the Non-defaulting Party's obligations hereunder or thereunder to Defaulting Party shall be deemed to be satisfied and discharged to the extent of such setoff, counterclaim or withholding."

(e)    **Waiver of Right to Trial by Jury.** To the extent permitted by applicable law, Party A and Party B hereby irrevocably waive any and all right to trial by jury with respect to any legal proceeding arising out of or relating to this Agreement or any transaction contemplated hereby.

(f)    **Additional Representations of Party B.** For purposes only of representations of or by Party B made in and deemed repeated pursuant to Section 3 of the Agreement, Section 3 of the Agreement is hereby amended as follows:

(1)  By adding the following language to subparagraph (d) of said Section 3, between the word "respect" and the period appearing in the third line of said subparagraph (d): ", and, with respect to any such information consisting of financial reports or information concerning it and/or its Affiliates, since the date of such financial reports or information there has been no material adverse change in its or its Affiliates' financial condition, operations or prospects"; and

(2)  By adding additional subparagraphs to said Section 3, which subparagraphs shall be lettered (e), (f), (g) and (h), respectively, and shall read as follows:

> "(e)  **Evaluation and Understanding.** It is capable of evaluating and understanding the structure, terms, conditions and risks of that Transaction. It is also capable of assuming and assumes the financial and other miscellaneous risks of the transaction."

> "(f)  **Commodity Exchange Act.** Either: (A) it is an "eligible contract participant", and no Transaction hereunder will be executed or traded on a "trading facility", as each such term is defined under the U.S. Commodity Exchange Act, as amended, and each Transaction has been the subject of individual negotiation between the parties; or (B) if it is not an "eligible contract participant", then (1) each Transaction and its material terms have been negotiated by the parties (in light of an individualized credit determination), are not standardized, and do not involve any commodity exchange style (x) right of termination through offset or (y) multi-lateral (as opposed to bi-lateral) margining arrangement and (2) each Transaction has been entered into by it in conjunction with its line of business or the financing or risk management of its line of business."

"(g) **No Agency.** It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise.)"

"(h) **Non-Reliance.** For any Relevant Agreement: (i) it acts as principal and not as agent, (ii) it acknowledges that the other party acts only at arm's length and is not its agent, broker, advisor or fiduciary in any respect, and any agency, brokerage, advisory or fiduciary services that the other party (or any of its affiliates) may otherwise provide to the party (or to any of its affiliates) excludes the Relevant Agreement, (iii) it is relying solely upon its own evaluation of the Relevant Agreement (including the present and future results, consequences, risks, and benefits thereof, whether financial, accounting, tax, legal, or otherwise) and upon advice from its own professional advisors, (iv) it understands the Relevant Agreement and those risks, has determined they are appropriate for it, and willingly assumes those risks, and (v) it has not relied and will not be relying upon any evaluation or advice (including any recommendation, opinion, or representation) from the other party, its affiliates or the representatives or advisors of the other party or its affiliates (except representations expressly made in the Relevant Agreement or an opinion of counsel required thereunder).

"Relevant Agreement" means this Agreement, each Transaction, each Confirmation, any Credit Support Document, and any agreement (including any amendment, modification, transfer or early termination) between the parties relating to any of the foregoing."

(g)     **Additional Agreement of Party B.** For purposes only of the agreements and covenants to be performed and observed by Party B pursuant to and in accordance with the provisions of the Agreement, Section 4 of the Agreement is hereby amended by adding an additional subparagraph thereto, which subparagraph shall be lettered (d) and shall read as follows:

"(d) **Covenants of Financial Agreements.**

(i) Party B shall provide Party A at all times hereunder with the same covenant protection as Party A requires of Party B under Financial Agreements. Therefore, in addition to the Cross Default provisions of this Agreement, and notwithstanding the satisfaction of any obligation or promise to pay money to Party A under any Financial Agreement, or the termination or cancellation of any Financial Agreement, Party B hereby agrees to perform, comply with and observe for the benefit of Party A hereunder all affirmative and negative covenants contained in each Financial Agreement applicable to Party B (excluding any obligation or promise to pay under any Financial Agreement) at any time Party B has any obligation (whether absolute or contingent) under this Agreement.

(ii) For purposes hereof:  (A) the affirmative and negative covenants of each Financial Agreement applicable to Party B (together with related definitions and ancillary provisions, but in any event excluding any obligation or promise to pay money under any Financial Agreement) are incorporated (and upon execution of any future Financial Agreement, shall automatically be incorporated) by reference herein (mutatis mutandis); (B) if other lenders or creditors are parties to any Financial Agreement, then references therein to the lenders or creditors shall be deemed references to Party A; and (C) for any covenant applying only when any loan, other extension of credit, obligation or commitment under the Financial Agreement is outstanding, that covenant shall be deemed to apply hereunder at any time Party B has any obligation (whether absolute or contingent) under this Agreement.

(iii) Notwithstanding the foregoing, if the incorporation herein of any provision by reference from any Financial Agreement would result in the violation of Party B of the terms of that Financial Agreement, this Agreement shall not incorporate that provision.

"Financial Agreement" means each existing or future agreement or instrument relating to any loan or extension of credit from Party A to Party B (whether or not anyone else is a party thereto), as the same exists when executed and without regard to any termination or cancellation thereof, or unless consented to in writing by

Party A, any amendment, modification, addition, waiver or consent thereto or thereof.

(h)     **Independent Obligations.** (i) Although Party B may be entering into one or more Transactions under this Agreement to hedge against the interest expense of, or other risk associated with, an existing or future loan or other financing, this Agreement and each Transaction shall be an independent obligation of Party B separate and apart from any such loan or other financing, and therefore: (A) each party's obligations under this Agreement or any Transaction shall not be contingent on whether any loan or other financing closes, is outstanding or is repaid, in whole or in part, at any time; (B) except as otherwise provided herein and subject to paragraph (ii) below, any repayment, acceleration, satisfaction, discharge or release of, and any amendment, modification or waiver with respect to, any loan or other financing, whether in whole or in part, at any time, shall not in any way affect this Agreement, any Transaction or either party's obligations under this Agreement or any Transaction; (C) payments that become due under this Agreement or any Transaction shall be due whether or not (1) the Notional Amount of any Transaction at any time is different from the principal amount of any loan or other financing, (2) the Termination Date of any Transaction occurs before or after the maturity date of any loan or other financing, or (3) any other terms of any loan or other financing are different from the terms of this Agreement or any Transaction, (D) nothing in this Agreement or in any Confirmation is intended to be, nor shall anything herein or therein be construed as, a prepayment penalty, charge or premium for purposes of any loan or other financing, nor shall any terms of any loan or other financing be deemed a waiver of or otherwise impair any amount due or that may become due under this Agreement or under any Transaction; (E) if Party B at any time receives from Party A (or any of its affiliates) any payoff statement or other written statement regarding any loan or other financing, nothing in such statement shall be deemed to apply to this Agreement or any Transaction except as otherwise expressly provided in that statement and then only to the extent so provided; and (F) if at any time any existing or future collateral or other credit support secures or otherwise supports both this Agreement (or any Transaction hereunder) and any loan or other financing (whether this Agreement or any Transaction hereunder is specifically identified in the collateral or credit support documents, or instead is referred to therein generically), then such collateral or other credit support shall continue to secure or otherwise support Party B's obligations under this Agreement (or any Transaction hereunder) until such time as all such obligations of Party B are completely satisfied notwithstanding any repayment, acceleration, satisfaction, discharge or release of any such loan or other financing.

(ii) Nothing in paragraph (i) above shall be construed as impairing or limiting: any set-off rights; any cross default, credit support default or other provisions contained in this Agreement or any Confirmation to the extent such provisions refer to any repayment or acceleration of any loan or other financing; any rights or obligations under any Credit Support Documents; or any obligations of Party B under any covenant incorporated in this Schedule by reference from any loan or other financing (provided that any amendment, modification or waiver executed and delivered by Party A in writing with respect to any such covenant shall be deemed to apply hereunder to that covenant as so incorporated unless otherwise expressly provided in such writing).

(i)     **Joint Party.** If more than one entity or natural person is executing this Agreement as Party B, then (i) the obligations of Party B under this Agreement (including any Credit Support Annex) and under each Transaction shall be the joint and several obligations of each such entity or natural person, (ii) any Event of Default or Potential Event of Default occurring with respect to any such entity or natural person shall be an Event of Default or Potential Event of Default, respectively, with respect to Party B, (iii) the death, release or discharge, in whole or in part, of any such entity or natural person, or the occurrence of any bankruptcy, liquidation, dissolution or any other event described in Section 5(a)(vii) with respect to any such entity or natural person, shall not discharge or affect the liabilities of any other such entity or natural person; (iv) unless the context otherwise requires, each reference in this Agreement (including any Credit Support Annex) or in any Confirmation to "party" shall, as applied to Party B, be construed as a joint and several reference to each such entity or natural person; and (v) any person or entity receiving notices given to Party B at the address shown above shall be deemed to receive such notices on behalf of each such entity or person.

**IN WITNESS WHEREOF,** the parties have executed this Schedule by their duly authorized signatories as of the date hereof.

REGIONS BANK

By: .....................................

Name:   Jason Maxwell

Title:   Senior Vice President

Date:   2-19.08

TBG & CC RECREATION, LLC

By: .....................................

Name:   Cora DiFiore

Title:   Manager

Date:

ARTHUR FALCONE

.....................................

Date:

EDWARD FALCONE

.....................................

Date:

<div align="right">EXHIBIT A</div>

## BORROWING AUTHORIZATION

COMPANY'S NAME:    TBG & CC RECREATION, LLC
COMPANY'S ADDRESS: 1951 NW 19th Street, Suite 200; Boca Raton, Florida 33431

<div align="center">Certificate</div>

The undersigned does hereby certify to REGIONS BANK (the "Lender") the accuracy of the applicable information set forth in paragraph 1 below and does hereby certify to and agree with the Lender as otherwise set forth below:

1.    The undersigned (check appropriate box)

**For corporations**
☐  Is the duly elected and qualified Secretary or other authorized officer of the Company, a corporation validly organized and existing under the laws of the State of _____.

**For partnerships (choose as appropriate)**
☐  Is the duly elected and qualified _____ Secretary of _____, a corporation which is (a) validly organized and existing under the laws of the State of _____ and (b) the managing general partner (the "General Partner") of the Company, a ☐ general ☐ limited partnership validly organized and existing under the laws of the State of _____. The names and addresses of the other general partners of the Company are listed at the end of this certificate.

☐  Is managing general partner of the Company, a ☐ general ☐ limited partnership validly organized and existing under the laws of the State of _____. The names and addresses of the other general partners of the Company are listed at the end of this certificate.

**For limited liability companies**
☐  Is a member of the Company    ☐  Is a manager of the Company,
        ☐  a member-managed limited liability company
        ☐  a manager-managed limited liability company
    validly organized and existing under the laws of the State of  Florida.

2.    Any ☐ **one** ☐ _____ *(insert number)* of the following persons (each an "Authorized Representative") (whose current office(s) or position(s) with the Company or General Partner, as the case may be, and whose true signature(s) are set forth below) shall have the authority, on behalf of the Company or General Partner, as the case may be, to implement the resolutions set forth in paragraph 3 below and to execute any and all documents required by the Lender in connection with the transactions pursuant to such resolutions; and there are no limitations in any manner to the authority of an Authorized Representative unless stated below.

| Name | Signature | Office or Position | Limitations (if any) |
|------|-----------|--------------------|----------------------|
| Cora DiFiore | | Manager | |
| Robert Falcone | | Manager | |

3.    The following is a true and correct copy of resolutions duly adopted by action of the Board of Directors, general partner(s), manager(s) or member(s), as the case may be, of the Company or General Partner, as the case may be, that the same are currently in full force and effect and have not been rescinded or modified, and that the same constitute all of the action required to authorize the transactions contemplated by such resolutions:

RESOLVED, that the Company is authorized, from time to time, without limitation, to borrow money from, to discount notes and other receivables with, apply for letters of credit from, to enter into other credit transactions (with interest thereon) and derivative transactions with REGIONS BANK (hereinafter called the "Lender") and that the amounts to be borrowed, the maturities, interest rates, security (if any), and all other terms and provisions of any loan, reimbursement, credit arrangement, or derivative transaction be left to the discretion of an Authorized Representative and that any Authorized Representative be and hereby is authorized to execute for and on behalf of the Company notes, agreements, indemnities, leases, guarantees

(whether related to its own obligations or those of others), and other instruments evidencing such credit arrangements, including modifications, extensions or renewals thereof; to discount and/or negotiate (with or without recourse) notes, drafts, acceptances, conditional sales contracts or other commercial paper; to apply for and obtain letters of credit or other forms of credit, to accept drafts and other items payable at the Lender; to waive presentment, demand, protest, and notice of protest or dishonor of any item made, drawn or endorsed by the Company; to give subordinations or other financial undertakings to the Lender; to endorse, assign, and guarantee receivables and other obligations discounted; to agree to any terms and conditions of such contracts as the Authorized Representative may be willing to sign; to transact any and all such other business with the Lender as at any time may be deemed appropriate or advisable by the Authorized Representative transacting the same; and to give as security any of the Company's assets, whether real or personal, tangible or intangible, and to execute such mortgages, deeds to secure debt, deeds of trust, instruments, agreements and other documents evidencing such security as may be necessary or desirable in connection therewith or to modify or change such instruments, agreements and other documents from time to time, as any authorized representative deems proper to secure such borrowing and to guarantee and/or secure the obligation of others to the Lender.

RESOLVED, that the Lender is authorized to sell, assign and endorse for transfer certificates representing stocks, bonds or other securities now registered or hereafter registered in the name of the Company; and any Authorized Representative is authorized to make agreements limiting the rights of the Company while any such loans remain unpaid or any such credit arrangements are in existence; provided that with respect to giving or perfecting any such security or taking any other action with respect thereto, the signature of only one Authorized Representative shall be sufficient to bind the Company, regardless of the number specified above. If any Authorized Representative exercises his authority to obtain loans or enter into credit arrangements with the Lender, or give security therefor, any other Authorized Representative or employee of the Company may thereafter do all things necessary, convenient, or proper in connection with obtaining the loan or credit arrangement or giving and perfecting the security.

RESOLVED, that the Company or General Partner, as the case may be, through the undersigned or other authorized person, shall certify to the Lender the names and signatures of those authorized to act by this resolution, and shall from time to time hereafter, as changes in the identity of such persons take place, immediately report and furnish such changes of name and signature to the Lender, and the Lender shall be fully protected in relying upon such certifications of any such person and shall be indemnified and saved harmless from any claims, demands, expenses, loss or damage resulting from or growing out of honoring the signature or request of any person so certified or for refusing to honor any signature or request of any person not so certified.

RESOLVED, that all transactions by any Authorized Representative, in the name and for the account of the Company or the General Partner, as the case may be, with the Lender prior to the adoption of these resolutions, be and the same are hereby ratified and approved.

RESOLVED, that the foregoing powers and authority shall continue in full force until written notice of revocation, in the form of a certificate signed by and on behalf of the Company or General Partner, as the case may be, by the undersigned or other authorized person, has been given to the Lender and its receipt obtained therefor notwithstanding the dissolution or termination of the Company.

4.     The Lender and Lender's Affiliates shall be fully protected in relying upon this Borrowing Authorization and shall be indemnified and held harmless by the Company from any and all claims, demands, expenses, losses or damages, including reasonable attorneys' fees, incurred by the Lender on account of the Lender's reliance on the signature of or action by an Authorized Representative.

5.     This Borrowing Authorization shall remain in full force and effect until such time as the Lender shall have received written notice of the amendment or rescission thereof from the undersigned or other authorized person and has had a reasonable time (not less than two full banking days) to act upon such notice.

Executed under seal this the 15ᵗʰ day of February , 2008.

Name: _____

Name: _____

Title: _____Manager_____

Title: _____Manager_____

- 2 -



## NOTICE OF DEFAULT

February 3, 2010

*Via Overnight Courier*

TBG & CC Recreation, LLC
Arthur Falcone
Edward Falcone
1951 NW 19th Street, Suite 200
Boca Raton, Florida 33431

Re:   Notice of Default under ISDA Master Agreement dated as of February 15, 2008 (the "Agreement") by and among TBG & CC Recreation, LLC, Arthur Falcone, and Edward Falcone (collectively, the "Company") and Regions Bank ("Regions")

Ladies and Gentlemen:

This is to inform you that a default under the Agreement has occurred and is continuing by virtue of the Company's failure to make the following required payments when due under Section 2(a)(i) of the Agreement:

| Payment Due Date | Amount Due |
|---|---|
| 1/27/2010 | $15,221.20 |
| 12/29/2009 | $14,779.35 |
| 11/30/2009 | $15,294.34 |
| 10/28/2009 | $14,850.52 |
| 9/29/2009 | $15,338.52 |
| 8/28/2009 | $15,247.20 |
| 7/28/2009 | $14,665.75 |

As such, notice is hereby given to the Company that **$105,396.88**, which is the amount due, must be paid to Regions on or before February 9, 2010, which is the third (3rd) Local Business Day after this Notice of Default is given to you.

This Notice of Default is being sent with a full reservation of all rights held by Regions pursuant to the Agreement and the other Transaction Documents (as hereinafter



defined).  In the event that the default set forth above is not cured, Regions intends to pursue all rights and remedies available to it under the Agreement, the other transaction documents related thereto (including but not limited to the Schedule to ISDA Master Agreement and any Confirmations in connection with the Agreement; all such documents collectively referred to herein as the "Transaction Documents") or at law or equity. Specifically, and without limitation, Regions reserves the right to declare other defaults that may exist now or that may occur in the future.  Further, Regions reserves all remedies it may have with respect to such Events of Defaults and reserves the right to pursue such remedies as may be appropriate under the circumstances.

Please be advised that the Agreement provides for late charges and the collection of interest at the Default Rate on the overdue amount.  Regions intends to recover all amounts provided for in the Agreement and other Transaction Documents

This letter is an attempt to collect a debt.  Any information obtained will be used for that purpose.

Time is of the essence for all purposes of this letter.  Any partial payment of the amounts due under the Agreement and the other Transaction Documents will be made at the risk of the Borrower.  Regions acceptance of any such partial payment will not constitute compliance with the terms of this letter, the Agreement, or the other Transaction Documents.  No action, inaction or indulgence by Regions with respect to amounts owed to it under the Agreement and the other Transaction Documents shall be deemed a waiver of any rights or a modification of the Agreement or Transaction Documents unless Regions has executed a written agreement expressly approving such result.

**NOTWITHSTANDING ANY PRIOR ACTION BY BORROWER TO THE CONTRARY, REGIONS HEREBY INSISTS ON STRICT COMPLIANCE WITH ALL TERMS AND CONDITIONS OF THE TRANSACTION DOCUMENTS.**

Sincerely,

REGIONS BANK

By: _____

Name: Jason Maxwell
Title:  Senior Vice President

cc:  Patrick Carrigan



### NOTICE OF EARLY TERMINATION

February 10, 2010

*Via Overnight Courier*

TBG & CC Recreation, LLC
Arthur Falcone
Edward Falcone
1951 NW 19th Street, Suite 200
Boca Raton, Florida 33431

    Re:    Notice of Early Termination under ISDA Master Agreement dated as of February 15, 2008 (the "Agreement") by and among TBG & CC Recreation, LLC, Arthur Falcone, and Edward Falcone (collectively, the "Company") and Regions Bank ("Regions")

Ladies and Gentlemen:

    This is to inform you that an Event of Default under Section 5(a)(i) of the Agreement has occurred and is continuing by virtue of the Company's failure to remedy its payment default within three (3) Local Business Days from the date of delivery of the notice of default letter (a copy of which is attached).

    As such, notice is hereby given that all Transactions (as defined in the Agreement) between Regions and the Company in effect under the Agreement will be terminated on Friday, February 12, 2010 (the "Early Termination Date"). Pursuant to the Agreement, Regions will provide to Company on or as reasonably practicable after the Early Termination Date a statement of any amounts that may be due to Regions as a result of such Event of Default and the details of the account to which such amounts may be paid. Please be aware that these amounts are in addition to any amounts that may be due to Regions pursuant to the Note, any loan agreement, any guarantees, or any other loan documents executed by the Company in favor of Regions. Capitalized terms used but not defined in this letter shall have the meanings given to such terms in the Agreement.

Sincerely,

Jason Maxwell
Senior Vice President

Cc:  Gavin S. Banta, Esq.
      Patrick Carrigan

REGIONS FINANCIAL CORPORATION · 1900 FIFTH AVENUE NORTH · ATLANTA, GEORGIA 30309
PHONE: 404 720 5000 · FAX: 404 720 5274





## NOTICE OF AMOUNTS DUE UPON EARLY TERMINATION

February 12, 2010

**Via Overnight Courier**

TBG & CC Recreation, LLC
Arthur Falcone
Edward Falcone
1951 NW 19th Street, Suite 200
Boca Raton, Florida 33431

Re:   Notice of Amounts Due Upon Early Termination of Transactions under ISDA Master
      Agreement dated as of February 15, 2008 (the "Agreement") by and among TBG & CC
      Recreation, LLC, Arthur Falcone, and Edward Falcone (collectively, the "Company")
      and Regions Bank ("Regions")

Gentlemen:

All Transactions between Regions and Counterparty in effect under the Agreement have been
terminated effective February 12, 2010.  Amounts due to Regions as a result of the Event of
Default occurring under the Agreement are as follows:

| Interest Rate Swap transaction: | Notional Amount: | $4,779,063.94 (*amortizing*) |
|---|---|---|
| | Trade Date: | February 27, 2008 |
| | Effective Date: | February 29, 2008 |
| | Stated Termination | |
| | Date: | February 27, 2013 |
| | **Total Amount Due:** | **$431,896.88** |

The total amount due of $431,896.88 in respect of the Transaction (which consists of both the
Settlement Amount determined in connection with the Event of Default, plus the Unpaid
Amounts under the Agreement) should be remitted to the following account on Wednesday,
February 17, 2009:

1050 PEACHTREE ROAD NE, SUITE 100 · ATLANTA, GEORGIA 30326
PHONE 404 279 7100 · FAX 404 279 7171



Bank:  Regions Bank
ABA:  062000019
GL:    1410010009000
Attention:    Treasury Operations
Reference:    TBG & CC Recreation, LLC


Failure to pay by the date indicated will result in amounts accruing at the Default Rate specified in the Agreement.  Note that these amounts are in addition to any amounts that may be due to Regions Bank pursuant to any promissory notes or loan documents executed by you in favor of Regions Bank.


Regards,

Jason Maxwell
Senior Vice President


cc:  Gavin S. Banta, Esq.
Patrick Carrigan